Nos. 22-55988, 56036

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AL OTRO LADO, INC., *et al.*,
*Plaintiffs-Appellees/Cross-Appellants*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*
*Defendants-Appellants/Cross-Appellees*,

and

the EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
*Appellant/Cross-Appellee.*

---

On Appeal from a Final Judgment Issued by the U.S. District Court for the
Southern District of California (Civil Action No. 3:17-cv-02366-BAS-KSC)

---

## OPENING BRIEF FOR THE GOVERNMENT

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT REGARDING CIRCUIT RULE 34-3 ........................... xi

INTRODUCTION ..............................................................................1

STATEMENT OF JURISDICTION....................................................4

STATEMENT OF THE ISSUES..........................................................5

STATEMENT OF THE CASE...............................................................7

    A.  Framework for Processing Inadmissible Noncitizens Seeking to
        Enter the United States at Ports of Entry.......................................7

    B.  A Migration Surge Severely Strains CBP's Ability to Safely
        Process Arriving Noncitizens and Diverts Resources From
        Critical Statutory Missions. .............................................................8

    C.  This Litigation: Plaintiffs Challenge CBP's Actions at Ports of
        Entry Along the U.S.-Mexico Border..........................................14

    D.  The District Court Issues Preliminary Injunctions Prohibiting the
        Prospective and Retrospective Application of an Unrelated
        Asylum-Eligibility Rule. ...............................................................16

    E.  The District Court Certifies a Class, Substantially Grants
        Summary Judgment for Plaintiffs, and Enters Burdensome
        Injunctive and Declaratory Relief Against the Government. ......19

SUMMARY OF THE ARGUMENT ....................................................24

ARGUMENT ......................................................................................27

    I.   The District Court Erred in Holding That Metering "Unlawfully
        Withheld" Mandatory and Ministerial Agency Action. ..............27

        A.  Sections 1158 and 1225 Do Not Apply to Noncitizens
            Outside the United States. ......................................................27

        B.  Metering Does Not "Unlawfully Withhold" Any Mandatory
            Agency Action on a Class-Wide Basis. .................................39

II.  The District Court Erred in Concluding That Metering Violates Procedural Due Process. ..................................................................46

III. The District Court Erred in Granting Burdensome Class-Wide Injunctive and Declaratory Relief. ...........................................49

    A.  The District Court Abused its Discretion. ..............................................50

    B.  The INA Bars the Injunctive Relief Ordered. .......................................52

CONCLUSION ...................................................................................................57

CERTIFICATE OF SERVICE ...........................................................................59

CERTIFICATE OF COMPLIANCE ...................................................................60

STATEMENT OF RELATED CASES ................................................................61

# TABLE OF AUTHORITIES

## Federal Cases

*Agency for International Development v. Alliance for Open Society International, Inc.*,
140 S. Ct. 2082 (2020) ................................................................. 46

*Al Otro Lado v. Wolf*,
945 F.3d 1223 (9th Cir. 2019) ..................................................... 18

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ................................................. 18, 29

*Almeida-Sanchez v. United States*,
413 U.S. 266 (1973) ..................................................................... 43

*Baker v. Carr*,
369 U.S. 186 (1962) ..................................................................... 45

*Boumediene v. Bush*,
553 U.S. 723 (2008) ......................................................... 22, 46, 47

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ..................................................................... 31

*CAIR v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) .............................................. 18

*Carroll v. United States*,
267 U.S. 132 (1925) ..................................................................... 43

*Chae Chan Ping v. United States*,
130 U.S. 581 (1889) ..................................................................... 44

*Cottonwood Environmental Law Center v. U.S. Forest Service*,
789 F.3d 1075 (9th Cir. 2015) ....................................................... 6

*Davis v. Michigan Dep't of Treasury*,
489 U.S. 803 (1989) ..................................................................... 29

*Department of Homeland Security v. Thuraissigiam*,
140 S. Ct. 1959 (2019) ............................................... 32, 37, 47, 49

*East Bay Sanctuary Covenant v. Barr*,
519 F. Supp. 3d 663 (N.D. Cal. 2021)............................................... 18, 49, 53

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ...................................................... 28, 38

*EEOC v. Arabian American Oil Co.*,
499 U.S. 244 (1991)....................................................................32

*Forest Guardians v. Babbitt*,
174 F.3d 1178 (10th Cir. 1999) ...................................................42

*Galvan v. Press*,
347 U.S. 522 (1954)....................................................................44

*Garland v. Aleman Gonzalez*,
142 S. Ct. 2057 (2022)......................................................... *passim*

*Garland v. Ming Dai*,
141 S. Ct. 1669 (2021)................................................................51

*Gonzalez v. Department of Homeland Security*,
508 F.3d 1227 (9th Cir. 2007) ................................................ 54, 55

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952)....................................................................45

*Hartford-Empire Co. v. United States*,
323 U.S. 386 (1945)....................................................................50

*Henderson v. United States*,
568 U.S. 266 (2013)....................................................................52

*Hernandez v. Mesa*,
140 S. Ct. 735 (2020)....................................................................1

*Ibrahim v. Department of Homeland Security*,
669 F.3d 983 (9th Cir. 2012) .......................................................48

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1980)....................................................................38

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950)............................................................47

*Kaplan v. Tod,*
    267 U.S. 228 (1925)............................................................37

*Kiyemba v. Obama,*
    555 F.3d 1022 (D.C. Cir. 2009)......................................38

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972)............................................................44

*Kwong Hai Chew v. Colding,*
    344 U.S. 590 (1953)............................................................47

*Landon v. Plasencia,*
    459 U.S. 21 (1982)..............................................................47

*Loving v. United States,*
    517 U.S. 748 (1996)............................................................44

*Melendres v. Arpaio,*
    784 F.3d 1254 (9th Cir. 2015) ........................................50

*Morrison v. National Australia Bank Ltd.,*
    561 U.S. 247 (2010)............................................................33

*Movimiento Democracia, Inc. v. Johnson,*
    193 F. Supp. 3d 1353 (S.D. Fla. 2016)..........................47

*Nishimura Ekiu v. United States,*
    142 U.S. 651 (1892)............................................................44

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004).......................................... 27, 39, 50

*Oetjen v. Central Leather Co.,*
    246 U.S. 297 (1918)............................................................45

*Orantes-Hernandez v. Thornburgh,*
    919 F.2d 549 (9th Cir. 1990) ........................................50

*Platero-Rosales v. Garland,*
— F.4th —, 2022 WL 17689178 (5th Cir. Dec. 15, 2022) ..........................44

*RJR Nabisco, Inc. v. European Community,*
579 U.S. 352 (2016)................................................................33

*Robleto-Pastora v. Holder,*
591 F.3d 1051 (9th Cir. 2010) ................................................38

*Rodriguez v. Hayes,*
591 F.3d 1105 (2009) ...............................................................57

*Rodriguez v. Swartz,*
899 F.3d 719 (9th Cir. 2018) ...................................................48

*Rowland v. Calfornia Men's Colony, Unit II Men's Advisory Council,*
506 U.S. 194 (1993)..................................................................35

*Sale v. Haitian Centers Council, Inc.,*
555 U.S. 155 (1993)....................................................... *passim*

*Shaughnessy v. United States ex rel. Mezei,*
345 U.S. 206 (1953)....................................................... 30, 43, 52

*Snowden v. Hughes,*
321 U.S. 1 (1944).......................................................................49

*Swartz v. Rodriguez,*
140 S. Ct. 1258 (2020).............................................................48

*Thomas v. County of Los Angeles,*
978 F.2d 504 (9th Cir. 1992) ...................................................51

*Torres v. Barr,*
976 F.3d 918 (9th Cir. 2020) ................................... 31, 32, 37, 41

*United States ex rel. Knauff v. Shaughnessy,*
338 U.S. 537 (1950)....................................................... 26, 43

*United States v. Balint,*
201 F.3d 928 (7th Cir. 2000) ...................................................28

*United States v. Delgado-Garcia*,
    374 F.3d 1337 (D.C. Cir. 2004) .................................................... 44

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) .................................................................. 46

*United States v. Villanueva*,
    408 F.3d 193 (5th Cir. 2005) ..................................................... 34

*Vietnam Veterans of America v. CIA*,
    811 F.3d 1068 (9th Cir. 2016) .................................................... 39

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ...................................................... 6

*Yang v. INS*,
    79 F.3d 932 (9th Cir. 1996) ....................................................... 38

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................. 26, 46

## Federal Statutes

1 U.S.C. § 1 ................................................................... 15, 35

5 U.S.C. § 555(b) .............................................................. 42

5 U.S.C. § 706(1) .................................................. 20, 24, 42, 50

5 U.S.C. § 706(2) .................................................... 39, 42, 45

6 U.S.C. § 111(b)(1) ........................................................... 44

6 U.S.C. § 202 ............................................................. 26, 44

6 U.S.C. § 211(c) .............................................................. 44

6 U.S.C. § 211(g)(3) ........................................................... 44

8 U.S.C. § 1101(a)(13)(C) ...................................................... 36

8 U.S.C. § 1103(a)(3) .......................................................... 26

8 U.S.C. § 1103(a)(5) .......................................................... 26

8 U.S.C. § 1158(a)(1) ............................................................. *passim*

8 U.S.C. § 1158(b)(2)(C) ........................................ 23, 51, 54, 55

8 U.S.C. § 1225(a)(1) ............................................................. *passim*

8 U.S.C. § 1225(a)(3) ................................................... 7, 16, 35

8 U.S.C. § 1225(b)(1)(A)(i) ............................................................. 30

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................ *passim*

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................. 54

8 U.S.C. § 1225(b)(1)(B)(v) ........................................... 53, 54

8 U.S.C. § 1225(b)(2)(C) ............................................................. 30

8 U.S.C. § 1229a(c)(4)(A) ............................................... 55, 56

8 U.S.C. § 1252(a)(2)(A) ............................................................. 52

8 U.S.C. § 1252(a)(5) ............................................................. 52

8 U.S.C. § 1252(b)(9) ............................................................. 52

8 U.S.C. § 1252(e) ............................................................. 52

8 U.S.C. § 1252(f)(1) ........................................... 22, 52, 53

8 U.S.C. § 1324(a)(2) ............................................................. 34

28 U.S.C. § 1291 ............................................................. 4

28 U.S.C. § 1331 ............................................................. 4

28 U.S.C. § 1350 ............................................................. 22

**Federal Rules**

Federal Rule of Appellate Procedure 4(a)(1)(B) ............................. 5

Federal Rule of Civil Procedure 65(d)(1) ............................................. 51

## Federal Regulations

8 C.F.R. § 100.4(a)..........................................................................8

8 C.F.R. § 208.30(e)(5)(iii) ......................................................... 53, 55

8 C.F.R. § 235.1(a)..........................................................................8

8 C.F.R. § 1001.1(q) ....................................................................30

8 C.F.R. § 1003.10(b) ..................................................................56

## Administrative Decisions

*Matter of E-R-M-*,
   25 I. & N. Dec. 520 (BIA 2011).............................................. 8, 40

*Matter of Lewiston-Queenston Bridge*,
   17 I. & N. Dec. 410 (BIA 1980)..................................................35

*Matter of M-D-C-V-*,
   28 I. & N. Dec. 18 (BIA 2020)....................................................30

## Administrative Rules

Asylum Eligibility and Procedural Modifications,
   84 Fed. Reg. 33,829 (July 16, 2019) ............................... 17, 53, 56

Asylum Eligibility and Procedural Modifications,
   85 Fed. Reg. 82,260 (Dec. 17, 2020)...........................................18

## Legislative Materials

H.R. Rep. No. 104-469, pt. 1 (1996) ................................................ 31, 32

Implementation of Title III of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration
   and Claims of the H. Comm. on the Judiciary, 105th Cong. (1997).............31

S. Rep. 96-256 (1980)...................................................................38

## Other Authorities

The American Heritage Dictionary of the English Language
(3d ed. 1992) ...................................................................... 29, 34, 35

The Oxford English Dictionary
(2d ed. 1989) ...................................................................... 29

//

## STATEMENT REGARDING CIRCUIT RULE 34-3

The Government submits that this case is entitled to priority in hearing date pursuant to Circuit Rule 34-3(3), as it involves the entry of a permanent injunction against the Government.

//

# INTRODUCTION

"The United States' border with Mexico extends for 1,900 miles, and every day thousands of persons and a large volume of goods enter this country at ports of entry on the southern border." *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020). "One of the ways in which the Executive protects this country is by attempting to control the movement of people and goods across the border, and that is a daunting task." *Id.* This appeal presents the question of whether, to help accomplish this daunting task, the Department of Homeland Security (DHS) and U.S. Customs and Border Protection (CBP) may manage the queue of undocumented noncitizens seeking entry to the United States through the Nation's Ports of Entry, or whether, as the district court held, the Immigration and Nationality Act (INA) imposes an inflexible obligation on the Executive to inspect for admission any and all undocumented noncitizens who approach the international border and wish to seek asylum in the United States, including those who have not yet crossed the border.

In early 2016, a sustained, overwhelming, and unprecedented surge of noncitizens without documents sufficient for admission (undocumented noncitizens) sought to enter the United States through the San Ysidro Port of Entry in San Diego. DHS and CBP made every effort to expand the Port's processing and holding capacity, including implementing its contingency plan for high-migration events, converting office and other spaces into temporary holding areas, and diverting Port officers

1

from anti-narcotics functions to help process migrants. But the queue continued to grow, until the line stretched from the primary inspection booth inside the Port building "clear south into Mexico." 3-ER-751. In late May 2016, around the time the Port surpassed 1,000 individuals in custody and individuals were sleeping outside—unprotected from the elements—for lack of holding space, San Ysidro temporarily stopped its intake at the international boundary and directed officers to focus their efforts on processing migrants already in custody.

This was the genesis of "metering," or "queue management," a process by which CBP regulated the pace at which undocumented noncitizens entered its Ports of Entry to seek admission to the United States, regardless of whether those noncitizens ultimately seek asylum here. CBP's Office of Field Operations (OFO), the division that operates the Ports of Entry, subsequently issued guidance to its four Field Offices along the southern border memorializing Port Directors' discretion to use metering or queue management procedures "[w]hen necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public." 2-ER-516. At all times, CBP's policy was that "[o]nce a traveler is in the United States, he or she must be fully processed." 2-ER-516. While this guidance was in place, the southern border Field Offices continued to intake and process inadmissible noncitizens, processing 13,601 more inadmissible noncitizens in Fiscal Year 2018 than in Fiscal Year 2017, and referring more than

twice as many of those noncitizens for credible-fear interviews (the first step in the asylum process for those in expedited removal). 2-ER-523.

The district court below nevertheless construed the INA as giving noncitizens in Mexico the right to apply for asylum *before* they come within the United States' borders, and imposing on CBP officers an obligation to inspect, and refer for asylum processing as applicable, any and all such noncitizens approaching the Ports of Entry, regardless of a Port's capacity to do so. The court's holding—and its corresponding overly broad declaratory relief—impairs the Executive's ability to ensure that its processing of noncitizens is conducted in an orderly and safe manner, as well as its overall ability to manage the Ports of Entry to our Nation, including, if necessary, by prioritizing the detection of national security and terrorist threats, and seizing illegal narcotics like fentanyl and other contraband. The court also determined that its ruling justified a burdensome permanent injunction effectively giving a subclass of asylum-seekers a right to have their asylum claims decided under the regulatory framework that existed at the time they would have crossed the border but for metering—more than any court has ever conferred upon noncitizens on the threshold of entry.

The district court was wrong in every respect.

The relevant provisions of the INA—8 U.S.C. §§ 1158(a) and 1225—apply exclusively to noncitizens *in* the United States. They do not confer rights upon, nor

impose obligations toward, noncitizens who have not entered this country. Congress did not write these provisions to impose extraterritorial duties that would interfere with the Executive's ability to control the manner and pace of entry into the United States, which is a fundamental act of sovereignty and well within the Executive's constitutional and statutory authority. And the district court's declaratory and injunctive relief was an abuse of discretion and otherwise prohibited by the INA. Consequently, this Court should reverse the decision below and remand with instructions to enter summary judgment for the Government and vacate any declaratory and injunctive relief.

## STATEMENT OF JURISDICTION

The U.S. District Court for the Southern District of California had jurisdiction over this case pursuant to 28 U.S.C. § 1331. However, under 8 U.S.C. § 1252, the district court lacked jurisdiction or authority to enter a class-wide permanent injunction.

This Court has jurisdiction over these cross-appeals from the district court's final judgment pursuant to 28 U.S.C. § 1291. On September 2, 2021, the district court partially granted and partially denied the parties' cross-motions for summary judgment. *See* 1-ER-84–128. On August 5, 2022, following supplemental briefing, the district court issued two opinions concerning final relief on Plaintiffs' claims.

*See* 1-ER-35–83; 1-ER-6–34. On August 23, 2022, the district court issued a separate document entering final judgment on all claims in the operative complaint. *See* 1-ER-2–5.

On October 21, 2022, the Government filed a timely notice of appeal from the district court's entry of final judgment. *See* 2-ER-304–308; Fed. R. App. P. 4(a)(1)(B). Plaintiffs noticed their cross-appeal on November 4, 2022. *See* 2-ER-303.

## STATEMENT OF THE ISSUES

1.     Did the district court err in holding that DHS and CBP unlawfully withheld their obligations under 8 U.S.C. §§ 1158(a)(1) and 1225 to inspect and refer for immigration proceedings undocumented noncitizens who approach the U.S.-Mexico border but are directed to remain outside the territorial United States (and, on that basis, violate those noncitizens' purported right to procedural due process), when those statutory provisions apply exclusively to a noncitizen "who is physically present in the United States" or who "arrives in" or "is arriving in" the United States, and when the undisputed evidence shows that CBP continued to process high volumes of those noncitizens while metering was in effect?

The Government raised, and the district court directly ruled on, this issue at the motion-to-dismiss stage and the summary-judgment stage. *See* 1-ER-218–301; 1-ER-84–128. This Court "review[s] de novo a district court's decisions on cross-

motions for summary judgment." *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1079 (9th Cir. 2015).

2.     Did the district court err in issuing a class-wide permanent injunction prohibiting the Government from applying a substantive rule of asylum eligibility to certain class members based on the date those members might have approached the U.S.-Mexico border with an intent to seek asylum, and requiring DHS and EOIR to undertake burdensome efforts to identify and unwind past potential applications of that regulation in expedited removal and removal proceedings, when principles of equity do not support the grant of such burdensome injunctive relief, and when such injunctive relief is prohibited by various provisions of 8 U.S.C. § 1252?

The Government raised, and the district court ruled on, this issue at the preliminary-injunction stage, the summary-judgment stage, and the remedy stage. *See* 1-ER-182–217; 1-ER-139–163; 1-ER-84–128; 1-ER-35–83; 1-ER-6–34; 1-ER-2–5. This Court "review[s] any legal conclusions" underlying a permanent injunction "de novo," and "review[s] the scope of injunctive relief for abuse of discretion." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).

## STATEMENT OF THE CASE

**A.  Framework for Processing Inadmissible Noncitizens Seeking to Enter the United States at Ports of Entry**

This case chiefly concerns two provisions of the INA: 8 U.S.C. § 1158(a) and

8 U.S.C. § 1225. Section 1158 allows noncitizens in the United States to apply for

asylum. It states:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1).

Section 1225 establishes procedures for immigration officers' inspection of

arriving noncitizens seeking admission. That section begins:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

*Id.* § 1225(a)(1). Section 1225 further states:

> All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

*Id.* § 1225(a)(3). By regulation, an "[a]pplication to lawfully enter the United States

shall be made in person to a U.S. immigration officer at a U.S. port-of-entry when

the port is open for inspection." 8 C.F.R. § 235.1(a). A Class A Port of Entry is one that is "designated . . . for all aliens." *Id.* § 100.4(a).

Section 1225 also describes how immigration officers must process an applicant for admission who is determined to be inadmissible based on fraud or for lack of sufficient entry documents and is processed for expedited removal, and who indicates an intention to apply for asylum:

> If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

8 U.S.C. § 1225(b)(1)(A)(ii). DHS has discretion whether to process an inadmissible arriving noncitizen for expedited removal, which would include, if necessary, referring the noncitizen for an interview with an asylum officer, or to place the noncitizen in Section 1229a removal proceedings, where they may raise any claims for humanitarian protection before an immigration judge. *See Matter of E-R-M-*, 25 I. & N. Dec. 520, 521–24 (BIA 2011).

**B.    A Migration Surge Severely Strains CBP's Ability to Safely Process Arriving Noncitizens and Diverts Resources From Critical Statutory Missions.**

Beginning in February 2016, increased numbers of noncitizens without documents sufficient for lawful entry began seeking admission to the United States at the

San Ysidro Port of Entry in San Diego, the busiest land border crossing in the Western Hemisphere. *See* 2-ER-578; 3-ER-756. People were arriving at the Port "in the hundreds," and CBP officials in Southern California had "exhausted every effort" to "expand any additional processing and detention capacity" to accommodate this influx. 3-ER-751. These efforts proved insufficient to address the surge. Migrants continued to "queue in an area between the limit line at the port of entry"—the line demarcating the international boundary between the United States and Mexico— "and the primary [pedestrian] lanes to wait until there was sufficient space" to be processed. 3-ER-750. By late May 2016, this queue stretched from the primary inspection booths at the Port "clear south into Mexico." 3-ER-751.

The number of individuals in custody at the Port eventually surpassed 1,000, and CBP officers at San Ysidro were compelled to "stop intake at the international boundary" because there "was no space" left. 3-ER-751; 2-ER-565; 2-ER-511–512. On a single day, "at least 950" people arrived in Tijuana to seek admission. 3-ER-719; 3-ER-765–766. Representatives from the U.N. High Commissioner for Refugees "confirmed" that "most" of these noncitizens were "not seeking asylum. . . . Instead, they [were] expressing interest in working and/or reuniting with family in the" United States. 3-ER-719. Eventually, the Government of Mexico "set[] up shelters in Tijuana" for people waiting to seek admission to the United States, rather than

continue to allow them to wait unsheltered in "a line staged on the Mexican side" of the border. 3-ER-712.

This migrant surge continued into the fall of 2016, began spreading east, and started to change in composition to include more families and unaccompanied minors. *See* 3-ER-702–708. Other Ports began to experience severe overcrowding, case-processing delays, and related adverse impacts to their operations. *See, e.g.*, 2-ER-584 (Brownsville Port of Entry had to re-allocate staff to address "high volume of detainees"); 2-ER-586 (Laredo Field Office had to divert staff, detail officers, and was "expanding use of port administrative space for temporary holding," which required additional personnel); 2-ER-589–592; 2-ER-594–595; 2-ER-597; 3-ER-732 (numbers in custody at the San Luis Port of Entry were "unsafe" and "unhealthy"); 2-ER-599 (Nogales Port of Entry implemented contingency plans); 3-ER-603 (Ports of Nogales and San Luis had "far exceeded capacity" and were "in desperate need of relief"). At one point, the El Paso Port of Entry in Texas was "providing up to 1,000 meals per day using microwaves." 2-ER-582. By mid-October 2016, the San Diego Field Office was utilizing 155% of its detention capacity; the Tucson Field Office was utilizing 231% of its detention capacity; the El Paso Field Office was using 99% of its detention capacity; and the Laredo Field Office was utilizing 106% of its detention capacity. 3-ER-609. Around that time, Immigration and Customs Enforcement (ICE)—which is responsible for longer-term detention of arriving

10

noncitizens—had "39,650 aliens in custody," "the highest level in [its] history." 3-ER-605. In Fiscal Year 2016, the southern border Ports of Entry encountered more than 150,800 inadmissible noncitizens, a 70% increase over Fiscal Year 2014. 3-ER-620.

Against this backdrop, in the fall of 2016, DHS and CBP evaluated and took additional, overarching steps to address overcrowding in order to lessen the strain of the unprecedented levels of migration on DHS's operations and mitigate humanitarian concerns. *See* 3-ER-623–627; 3-ER-758; 3-ER-647–648; 2-ER-344–373. CBP's plans included metering the intake of noncitizens without documents sufficient for lawful entry. Initially, metering practices were not standardized, but OFO sought to work with Ports to try to conform practices with its overarching policy. *See, e.g.*, 3-ER-769 (noting that a Port mistakenly implemented metering procedures "on the U.S. side" of the border); 3-ER-642 (showing that OFO headquarters was working with the Port to address the issue); 3-ER-638 (email from OFO headquarters clarifying that "[i]f any individual arrives at POE, we cannot just send them back to MX [Mexico] . . . but must process them upon arrival"); 3-ER-644; 3-ER-785.

In early 2018, the number of undocumented noncitizens approaching the border again began to rise and "start[ed] to reach a high point in the spring of 2018." 3-ER-696–697; *see also* 3-ER-653; 3-ER-659; 3-ER-665; 3-ER-671. Ports began to report "impacts to frontline functions" from the "increase in detainees." 3-ER-674;

11

*see also* 3-ER-676; 3-ER-678. In April 2018, CBP was preparing to encounter a "migrant caravan" of between 500 and 600 people that was making its way north from southern Mexico to the U.S.-Mexico border. 3-ER-773–774.

On April 27, 2018, the OFO Executive Assistant Commissioner issued a memorandum with the subject line "Metering Guidance" to the Directors of Field Operations for the four southern border Field Offices. *See* 2-ER-516. The memorandum states: "When necessary or appropriate to facilitate orderly processing and maintain the security of the port and safe and sanitary conditions for the traveling public, [Directors] may elect to meter the flow of travelers at the land border to take into account the port's processing capacity." 2-ER-516. When metering, "[p]orts should inform the waiting travelers that processing at the port is currently at capacity and CBP is permitting travelers to enter the port once there is sufficient space and resources to process them." 2-ER-516. Directors "may establish and operate physical access controls at the borderline." 2-ER-516. Ports "may not create a line specifically for asylum-seekers only, but could, for instance, create lines based on legitimate operational needs, such as lines for those with appropriate travel documents and those without such documents." 2-ER-516. "At no point may an officer discourage a traveler from waiting to be processed, claiming fear of return, or seeking any other protection." 2-ER-516. "Once a traveler is in the United States, he or she must be fully processed." 2-ER-516.

The number of inadmissible arriving noncitizens processed by the southern border Field Offices continued to trend upwards (from 111,275 noncitizens in FY 2017, to 124,879 in FY 2018), and the proportion of those noncitizens who were referred for credible-fear interviews under the expedited-removal process doubled (from 17,284 in FY 2017, to 38,399 in FY 2018). 2-ER-523.

On June 5, 2018, the Secretary of Homeland Security issued a memorandum to the CBP Commissioner entitled "Prioritization-Based Queue Management." *See* 2-ER-518–520. In recognition of the rising apprehensions of undocumented travelers and CBP's resource constraints, the Secretary instructed CBP to focus on its "primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel." 2-ER-518. The Secretary directed the Commissioner to initiate a pilot program "to prioritize staffing and operations" at the southern border Ports in "the following order of priority": (1) national-security efforts; (2) counter-narcotics operations; (3) economic security; and (4) trade and travel facilitation. 2-ER-520. The Secretary explained that "[p]rocessing persons without documents required by law for admission arriving at the Southwest Border remains a component of CBP's mission, but priority should be given to the efforts described above in the prescribed order." 2-ER-520. After the DHS memo, the number of inadmissible arriving noncitizens processed by the southern border Field Offices continued to trend upwards,

and the proportion of those noncitizens who were placed into expedited removal and referred for a credible-fear interview doubled again. 2-ER-523. In November 2019, the Acting CBP Commissioner directed OFO to continue operating under the terms of the June 2018 memorandum. *See* 2-ER-526–531.

In November 2021, DHS and CBP rescinded all metering memoranda, and CBP issued new guidance for management and processing of undocumented noncitizens at southern border Ports of Entry. *See* 2-ER-314–316; 2-ER-318.

**C.**  **This Litigation: Plaintiffs Challenge CBP's Actions at Ports of Entry Along the U.S.-Mexico Border.**

In July 2017, Plaintiff Al Otro Lado, Inc., and several individual noncitizens filed this lawsuit on behalf of a putative class, challenging CBP's actions at Class A land Ports of Entry along the U.S.-Mexico border. Plaintiffs contended that DHS's and CBP's conduct violated the INA, the Administrative Procedure Act (APA), the Due Process Clause, and the international law norm of non-refoulement. *See* 4-ER-910–921. Plaintiffs asserted that when a CBP officer prevents an undocumented noncitizen who intends to seek asylum in the United States from immediately crossing the U.S.-Mexico border into a Port of Entry, the officer deprives the noncitizen of a right to apply for asylum under Section 1158(a)(1) and fails to discharge his duty to either refer that noncitizen for credible-fear screening under Section 1225(b)(1)(A)(ii) or place him in removal proceedings under Section 1225(b)(2)(A),

and on those bases also violates that noncitizen's claimed right to procedural due process.

In November 2018, the Government moved to dismiss the operative complaint. The Government argued that metering is lawful because Sections 1158(a) and 1225 apply only to noncitizens "in the United States," so CBP does not violate those statutes by preventing a noncitizen who is outside the United States from immediately crossing the border. The Government also argued that metering is a lawful exercise of the Executive's constitutional and statutory authority to control the flow of travel across the border.

In July 2019, the district court substantially denied that motion to dismiss. *See* 1-ER-218–301. The court reasoned that Sections 1158(a)(1) and 1225(b)(1)(A)(ii) apply extraterritorially to noncitizens who are outside the United States and wish to arrive through a Port of Entry to seek asylum. *See* 1-ER-252–264. The court reasoned that Section 1158(a)(1) provides a right to apply for asylum to both any noncitizen "who is physically present in the United States" and any noncitizen "who arrives in the United States," 1-ER-253–254; that, under the rule against surplusage, the latter category presumptively must encompass a different group of noncitizens than the former category, *see* 1-ER-253; and that, given the rule against surplusage and the Dictionary Act's general rule (at 1 U.S.C. § 1) that "the present tense include[s] the future as well as the present," Section 1158(a)(1) confers a right to apply

for asylum on a noncitizen who has not yet arrived in the United States but who has approached a Port of Entry to seek admission—that is, someone who is "in the process of arriving in the United States" through a Port of Entry, 1-ER-255; *see also* 1-ER-252–264.

The district court applied similar reasoning to Section 1225. That statute states that immigration officers "shall . . . inspect[]" noncitizens who are "applicants for admission or otherwise seeking admission," 8 U.S.C. § 1225(a)(3), and "shall" refer for a credible-fear interview an inadmissible noncitizen "who is arriving in the United States" and intends to seek asylum, *id.* § 1225(b)(1)(A)(ii). According to the district court, this language shows that Section 1225 applies to noncitizens who were "in the process of seeking admission into the United States or otherwise attempting to do so"—and thus covers noncitizens who reached the southern border to seek asylum. 1-ER-264; *see also* 1-ER-261–264.

## D. The District Court Issues Preliminary Injunctions Prohibiting the Prospective and Retrospective Application of an Unrelated Asylum-Eligibility Rule.

On July 16, 2019, the Attorney General and the Acting Secretary of Homeland Security issued an interim final rule—known as the transit rule—governing substantive asylum eligibility for noncitizens who enter the United States across the southern border. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg.

33,829 (July 16, 2019). This rule, while it was in effect, rendered ineligible for asylum "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country" without applying for protection there. *Id.* at 33,843. The rule also created new regulations requiring asylum officers and immigration judges to apply the bar during credible-fear determinations and in removal proceedings. *Id.* at 33,844.

Plaintiffs in this case sought to enjoin the rule as to those who had been subject to metering before its effective date. On November 19, 2019, the district court issued a prospective preliminary injunction that prohibited DHS "from applying" the interim final rule to a certified class of "all non-Mexican asylum-seekers who were unable to make a direct asylum claim at a U.S. POE [Port of Entry] before July 16, 2019 because of the U.S. Government's metering policy, and who continue to seek access to the U.S. asylum process." 1-ER-217. The court reasoned that, because the rule "clearly state[d] that it applie[d] only to aliens who entered, attempted to enter, or arrived on or after July 16, 2019," the rule "by its express terms" did not apply to those who, before July 16, 2019, "were prevented from making a direct claim at a POE pursuant to the metering policy." 1-ER-213. Under the reasoning of the court's motion-to-dismiss order, such noncitizens were already "'in the process of arriving

in the United States through a POE'" before the rule's effective date, and thus were not subject to the rule. 1-ER-212 (quoting 1-ER-252–264).[1]

The Government appealed. A motions panel of this Court initially issued an administrative stay of the preliminary injunction, *see Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019), and later denied a stay pending appeal, *see Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020). In its order denying a stay pending appeal, the motions panel majority said that "the district court's interpretation of 'arrives in the United States' is likely correct." *Id.* at 1011; *see also id.* at 1010–13. The dissent disagreed, explaining that there was no "authority for the proposition that our country's asylum laws apply to persons who are not physically located in the United States, but who are outside our borders yet 'in the process of arriving in' the United States." *Id.* at 1027 (Bress, J., dissenting); *see also id.* at 1027–32.

On October 30, 2020, while the appeal from the November 2019 order was pending, the district court issued a second, retrospective preliminary injunction re-

---

[1] On June 30, 2020, the interim final rule was vacated on procedural grounds in separate litigation. *See CAIR v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020). On December 17, 2020, the Government issued the superseding final rule, and clarified there that it always intended the transit bar to apply to noncitizens subject to metering. *See* Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260, 82,268 n.22 (Dec. 17, 2020). The district court enjoined the application of the final rule to subclass members on substantially the same basis as discussed above. *See* 1-ER-129–138. The final rule was thereafter enjoined nationwide in separate litigation. *See East Bay Sanctuary Covenant v. Barr*, 519 F. Supp. 3d 663 (N.D. Cal. 2021).

quiring the Government to "reopen or reconsider" applications of the rule that permissibly occurred before the first injunction was issued or while it was stayed, and extending its preliminary injunctions to non-party the Executive Office for Immigration Review (EOIR). *See* 1-ER-146–152, 1-ER-163. The Government appealed again. On September 9, 2022, after the district court issued final judgment, this Court dismissed both interlocutory appeals as moot. *See* Order (Dkt. 135), *Al Otro Lado v. Wolf*, No. 19-56417 (9th Cir. Sept. 20, 2022); Order (Dkt. 94), *Al Otro Lado v. Wolf*, No. 20-56287 (9th Cir. Sept. 20, 2022).

**E.    The District Court Certifies a Class, Substantially Grants Summary Judgment for Plaintiffs, and Enters Burdensome Injunctive and Declaratory Relief Against the Government.**

On August 6, 2020, the district court certified two Rule 23(b)(2) classes: a class of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A POE on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of CBP officials on or after January 1, 2016"; and a subclass of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." 1-ER-181; *see also* 1-ER-164–181. The court concluded that the class and subclass each meet the four requirements of Rule 23(a), *see* 1-ER-170–179, and that each satisfied Rule 23(b)(2) because the court was tasked in the main with deciding

whether metering "is unlawful regardless of the grounds," 1-ER-179–180. Conse-
quently, CBP officers' purported "refusal to process asylum-seekers" constituted a
"generally applicable ground for class-wide relief." 1-ER-180.

On September 2, 2021, the district court partially granted and partially denied
the parties' cross-motions for summary judgment. *See* 1-ER-84–128. First, the court
granted summary judgment for the Government on Plaintiffs' *ultra vires* INA claim,
reasoning that Plaintiffs' "could obtain review" of that claim under the framework
of the APA. 1-ER-96; *see* 1-ER-94–96.

Second, the district court granted summary judgment for Plaintiffs on their
claim under the APA, at 5 U.S.C. § 706(1), that by metering, the Government un-
lawfully withheld discharging its purported mandatory obligations to class members
under 8 U.S.C. §§ 1158(a) and 1225. *See* 1-ER-96–117. The court decided that
Plaintiffs had identified a sufficiently final and discrete class-wide agency action to
permit APA review—specifically, their contention that CBP "did not inspect and
refer class members as they arrived at POEs and instead turned them away." 1-ER-
101–102; *see also* 1-ER-97–102. Relying again on its motion-to-dismiss order, the
court concluded that "the plain language" of Sections 1158(a) and 1225 "applies to
migrants who are 'in the process of arriving,' which includes 'aliens who have not
yet come into the United States, but who are attempting to do so' and may still be
physically outside the international boundary line at a POE." 1-ER-102 (quoting 1-

ER-264). The court also employed an unprompted *Chevron* analysis to conclude that CBP's statutory obligations to inspect and refer noncitizens "attach when asylum seekers arrive at a POE the first time," and metering thus constituted an unlawful failure under 5 U.S.C. § 706(1) to discharge the mandatory obligations imposed by Section 1225 (rather than an unreasonable delay in discharging those obligations). *See* 1-ER-109–117. The court reasoned that the Government's "inspection and referral" duties "attach when asylum seekers arrive at a POE for the first time," 1-ER-113, so it was unlawful to require class members to "make return trips" to the Ports "to access the [asylum] process," 1-ER-115. The court did not address whether the record alternatively supported a finding of unreasonable delay under Section 706(1). 1-ER-117. And, since it found metering "unlawful regardless of [its] purported justification," the court declined "to address the parties' arguments regarding the § 706(2) arbitrary and capricious claim based on pretext" and dismissed that claim as moot. 1-ER-117.

Third, the district court granted summary judgment for Plaintiffs on their Fifth Amendment claim that the Government violated class members' purported procedural due process rights. *See* 1-ER-117–121. It rejected the Government's arguments that class members on foreign soil have no due process rights under the Fifth Amendment, reasoning instead that "under the functional approach" in *Boumediene v. Bush*,

553 U.S. 723 (2008), "the Fifth Amendment applies to conduct that occurs on American soil and therefore applies here." 1-ER-120. On the merits, the court concluded that, because "Defendants' turning back of asylum seekers unlawfully withholds their duties under" Sections 1158(a) and 1225, it thus "violates the process due to class members" on the exact same basis. 1-ER-121.

Finally, the court granted summary judgment for the Government on Plaintiffs' claim under the Alien Tort Statute, at 28 U.S.C. § 1350, that metering violates the international law norm of non-refoulement. *See* 1-ER-121–126. The court reasoned that it is not "universal[ly]" accepted in the international community that the principle of non-refoulement can apply before a noncitizen enters a nation's territory, 1-ER-124, and that the Supreme Court in *Sale v. Haitian Centers Council, Inc.*, 555 U.S. 155, 183 (1993), held that the multinational treaty provision codifying the non-refoulement obligation in international law does not apply to "'aliens outside [a country's] own territory,'" 1-ER-125.

On August 5, 2022, after receiving supplemental briefing, the district court ordered relief on Plaintiffs' claims in two different opinions. In its "Remedies Opinion," the court denied an injunction against metering, but granted classwide declaratory relief. *See* 1-ER-6–34. The court explained that it would have issued a permanent injunction prohibiting the Government from metering but was prevented from doing so by 8 U.S.C. § 1252(f)(1), as interpreted by the Supreme Court in *Garland*

*v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022). *See* 1-ER-17–30. The district court thus entered class-wide declaratory relief stating:

> The Court **DECLARES** that, absent any independent, express, and lawful statutory authority, Defendants' denial of inspection or asylum processing to Class Members who have not been admitted or paroled, and who are in the process of arriving in the United States at Class A Ports of Entry, is unlawful regardless of the purported justification for doing so.

1-ER-3. As the metering memoranda at issue had since been rescinded, the district court's order did not vacate those memoranda. *See* 1-ER-27–28.

In its second opinion and order, the district court converted its preliminary injunctions against the application of the interim final and final transit rules into a permanent injunction on largely the same terms as those preliminary orders. *See* 1-ER-77–81; *see also* 1-ER-4–5. The court granted this relief based on its decision on the merits, the "express" language of the transit rule, and the court's prior findings concerning irreparable harm and the balance of the equities and the public interest. *See* 1-ER-77–78, 1-ER-80. The court reasoned that Section 1252(f)(1) does not bar the injunction because the injunction prohibits only the application of a regulation issued under 8 U.S.C. § 1158(b)(2)(C), and thus does not "interfere[] with the operation of 8 U.S.C. §§ 1221 through 1332." 1-ER-80.

On August 23, 2022, the district court entered final judgment in accordance with its summary-judgment order and its two remedies opinions. *See* 1-ER-2–5. The

Government timely appealed from the final judgment and all incorporated orders, *see* 2-ER-304–308, and Plaintiffs timely cross-appealed, *see* 2-ER-303.

## SUMMARY OF THE ARGUMENT

This Court should reverse the decision below and remand this case to the district court with instructions to enter summary judgment for the Government on all claims and to vacate its injunctive and declaratory relief.

I.A. The district court erred in granting summary judgment to Plaintiffs on their claim that DHS and CBP "unlawfully withheld" discharging their obligations under Sections 1158(a) and 1225 to noncitizens outside the United States on a class-wide basis, in violation of the APA at 5 U.S.C. § 706(1). Section 1158(a)(1) permits a noncitizen "who is physically present *in* the United States or who arrives *in* the United States" to apply for asylum. 8 U.S.C. § 1158(a)(1) (emphases added). Likewise, Section 1225 directs immigration officers to inspect "[a]n alien present *in* the United States . . . or who arrives *in* the United States" for admissibility, *id.* § 1225(a)(1), and to refer a noncitizen "who is arriving *in* the United States" for a credible-fear interview if he is inadmissible on certain grounds and indicates an intention to seek asylum or a fear of persecution, *id.* § 1225(b)(1)(A)(ii) (emphases added). These statutes, by their terms, apply exclusively to noncitizens within the territorial borders of the United States. The Government thus had no mandatory and

ministerial obligation to inspect class members who are in Mexico or refer them for asylum processing.

B. Even if the relevant statutes applied to noncitizens in Mexico, the district court still erred in granting summary judgment to Plaintiffs on their Section 706(1) claim. The undisputed material evidence demonstrates that CBP continued to process class members for expedited removal and refer them for credible-fear screening concurrently with the implementation of metering—and that the number of credible-fear referrals on the southern border increased four-and-a-half times over while metering was in effect, compared to the immediately preceding period. Faced with that evidence, the district court had no warrant to find that CBP "withheld" its obligations under Sections 1158 and 1225 on a class-wide basis. At most, metering *delays* the actions required by statute, and, in this case, reasonably so, given the overwhelming challenges that CBP personnel faced at the Ports of Entry. The district court was similarly wrong to the extent that its holding requires CBP to discharge its inspection and referral duties immediately and inflexibly to every class member. That conclusion is neither compelled by the statutory text nor the factual realities of controlling the Nation's borders. Further, it is entirely within the Executive's statutory and constitutional authority to control the pace of travel across the border—including by controlling the pace of intake of undocumented noncitizens at the international

boundary. *See* 6 U.S.C. § 202; 8 U.S.C. §§ 1103(a)(3), 1103(a)(5); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

II. The district court erred by granting summary judgment for Plaintiffs on their procedural due process claim. It is well settled that the Fifth Amendment does not apply to foreign citizens on foreign soil. That is especially true in immigration law, in which "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The district court was wrong to hold that the Fifth Amendment can bestow rights on noncitizens standing in Mexico. And, even if class members had a constitutionally protected interest in Sections 1158 and 1225, and even if Plaintiffs could prove class-wide deprivation of that interest, that does not automatically amount to a due process violation.

III.A. In addition to its errors on the merits, the district court abused its discretion in granting burdensome declaratory and injunctive relief. B. The lower court's class-wide injunction is also prohibited by several provisions of 8 U.S.C. § 1252.

Consequently, this Court should reverse the decision below and vacate the district court's declaratory and injunctive relief.

**ARGUMENT**

## I. The District Court Erred in Holding That Metering "Unlawfully Withheld" Mandatory and Ministerial Agency Action.

### A. Sections 1158 and 1225 Do Not Apply to Noncitizens Outside the United States.

"A claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). The district court erred in granting summary judgment to Plaintiffs on their Section 706(1) claim because Sections 1158 and 1225 apply exclusively to noncitizens inside the United States, and thus do not impose any such mandatory actions on DHS or CBP toward noncitizens located in Mexico. Accordingly, metering at the international boundary does not withhold agency action.

Under the INA, "[a]ny alien who is physically present *in* the United States or who arrives *in* the United States . . . may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphases added). If an inadmissible noncitizen "who is arriving *in* the United States" and is subject to expedited removal indicates an intention to apply for asylum or a fear of persecution to an immigration officer, the officer "shall refer the alien for an interview by an asylum officer." *Id.* § 1225(b)(1)(A)(ii) (emphasis added). These provisions unambiguously require a noncitizen to be *in* the United States to apply for asylum, and for immigration officers to have any obligation to inspect

noncitizens for admission, process them for expedited removal, or refer them for a credible-fear interview with an asylum officer.

The district court believed that the present-tense phrase "arrives in" in Section 1158(a)(1) shows that arrival is not a discrete event of physically being within the United States, but is instead a process that begins before arrival: someone who approaches the border with an intent to apply for asylum is someone who "arrives in" the United States, because they are "in the process of arriving in" the United States. 1-ER-252–44; 1-ER-102–103, 1-ER-105–108. But Section 1158(a)(1) does not speak to a *process* of arrival. It permits a noncitizen to apply for asylum the moment the noncitizen "is physical[ly] present *in*" or "arrives *in*" the United States. 8 U.S.C. § 1158(a)(1) (emphases added). "By definition, asylum concerns those 'physically present in the United States.'" *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018) (quoting 8 U.S.C. § 1158(a)(1)). The statute's use of the simple present tense creates a nexus between a noncitizen's right to apply for asylum and his current physical presence or arrival "*in* the United States." 8 U.S.C. § 1158(a)(1). A present-tense phrase like "arrives in" speaks to the present moment of arrival, not some potential arrival in the future. *See United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) (noting that the present tense "often indicates contemporaneous action, . . . particularly in the simple present tense").

The definition of the verb "arrive" reinforces that conclusion. "When we say that a person 'arrives' in a location, we mean he *reaches* that location, not that he is somewhere on his travels toward it. An alien thus 'arrives in' the United States or he does not; there is no in-between." *Al Otro Lado*, 952 F.3d at 1028 (Bress, J., dissenting); *see also* The Oxford English Dictionary 651 (2d ed. 1989) (defining "arrive" as "to come to the end of a journey, to a destination, or to some definitive place"); The American Heritage Dictionary of the English Language 102 (3d ed. 1992) (defining "arrive" as "to reach a destination"). Thus, "[o]ne who 'arrives in the United States' is one who, at the very least, has crossed *into* the United States." *Al Otro Lado*, 952 F.3d at 1028 (Bress, J., dissenting).

This same reasoning applies to the use of the words "arrives in" and "arriving in" in Sections 1225(a)(1) and 1225(b)(1)(A)(ii). Although the present-progressive phrase "arriving in" in Section 1225(b)(1)(A)(ii) plausibly denotes a process of arrival, nothing in either Section 1158 or 1225 indicates that such a process begins *before* a noncitizen crosses the border. To the contrary, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989). Section 1225 as a whole focuses on the inspection of "[a]n alien present in the United States who has not been admitted or who arrives in the United States," 8 U.S.C. § 1225(a)(1), and on the "remov[al]" of such noncitizens "from the United States," *id.*

§ 1225(b)(1)(A)(i); *see also id.* § 1225(b)(2)(C) (permitting the Government to "return" a noncitizen "who is arriving on land" from a contiguous foreign territory back to that territory pending removal proceedings). Section 1225 as a whole thus indicates that a process of "arriving in the United States" begins when a noncitizen crosses the border and generally continues until the Government makes a final admissibility determination. *See Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (BIA 2020) (holding that a noncitizen "apprehended just inside the border upon crossing into the United States . . . is properly considered to be 'arriving'" under 8 U.S.C. § 1225(b)(2)(C)); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213 (1953) (describing a noncitizen detained at the port of entry on Ellis Island as "an entering alien"); 8 C.F.R. § 1001.1(q) (providing that "[t]he term arriving alien means an applicant for admission coming or attempting to come into the United States *at a port-of-entry*," and that "[a]n arriving alien remains an arriving alien even if paroled" (emphasis added)).

The district court pointed to "legislative history" showing that the term "arriving alien" "'was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders.'" 1-ER-257 (quoting Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary, 105th Cong.

17–18 (1997)). But the court's reliance on this 1997 statement was misplaced, as it post-dates Congress's 1996 enactment of Section 1225 and thus has no bearing on that statute's meaning. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."). In any event, to the extent this legislative history is relevant at all, it confirms that Section 1225 covers "all aliens who are in the process of physical entry *past* our borders," 1-ER-257 (emphasis added), not those who have never crossed the border in the first place. Concurrent congressional documents support this understanding. *See, e.g.*, H.R. Rep. No. 104-469, pt. 1, at 175–76 (1996) (noting that an asylum claim should "be commenced as soon as possible *after* the alien's arrival in the U.S." (emphasis added)).

The court also reasoned that interpreting Sections 1158 and 1225 not to apply to noncitizens in Mexico "would . . . defeat the purpose of the 1996 amendments to the INA," because those amendments were intended to "'ensure[] that all immigrants who have not been lawfully admitted, *regardless of their physical presence in the country*, are placed on equal footing in removal proceedings under the INA—in the position of an applicant for admission.'" 1-ER-108 (quoting *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (emphasis district court's). Not so. This Court explained in *Torres* that the purpose of the 1996 amendments to Section 1225(a)(1) was to in-

clude those who are physically present in the United States as applicants for admission along with those who arrive in the United States, such that those who "'entered the United States without inspection'" did not "'gain equities and privileges in immigration proceedings that [were] not available to aliens who present themselves for inspection at a port of entry.'" *Torres*, 976 F.3d at 928 (quoting H.R. Rep. 104-469, pt. 1, at 225). It did not address whether someone who stands on the other side of the border is entitled to inspection. Further, it was also Congress's purpose in enacting the 1996 amendments—indeed, its primary purpose—to "craft[] a system for weeding out patently meritless claims and expeditiously *removing the aliens making such claims from the country.*" *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959, 1963 (2019) (emphasis added). Nothing in the 1996 amendments or *Torres* suggests that the INA was meant to extend asylum processing into other countries, nor to require immigration officers to allow undocumented noncitizens to cross the border without entry controls when the Ports of Entry are overwhelmed.

The presumption against extraterritoriality further confirms that Sections 1158 and 1225 apply only to individuals within the United States. It is settled that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991). "The question is not whether [a court] think[s] 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought

of the situation before the court,' but whether Congress has *affirmatively and unmistakably instructed* that the statute will do so. 'When a statute gives no clear indication of extraterritorial application, it has none.'" *RJR Nabisco, Inc. v. European Community*, 579 U.S. 352, 335 (2016) (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255, 261 (2010)) (emphasis added).

Applying this principle in *Sale v. Haitian Centers Council, Inc.*, the Supreme Court concluded that exclusion and deportation procedures (where asylum claims were raised) were not available beyond our borders because the relevant INA provisions did not contemplate any extraterritorial application. *See Sale*, 509 U.S. at 174; *id.* at 173 & n.29 (citing a prior version of 8 U.S.C. § 1158(a) as a statute that "obviously contemplate[s] that such proceedings would be held within the country"). Like the provisions governing the former exclusion and deportation proceedings at issue in *Sale*, Sections 1158 and 1225 here similarly contain no "affirmative[] and unmistakabl[e] instruct[ion]" that Congress intended them to apply abroad. *RJR Nabisco, Inc.*, 579 U.S. at 335. As explained, those statutes by their terms apply only to a noncitizen who "is physically present in" or who "arrives *in*" or "is arriving *in* the United States." 8 U.S.C. §§ 1158(a)(1), 1225(a)(1), 1225(b)(1)(A)(ii) (emphases added). Even if immigration officers are stationed within the United States when metering, and thus "acting from within the United States," 1-ER-259, Section 1225 imposes no obligation towards noncitizens outside the United States.

33

The district court held that the presumption against extraterritoriality was rebutted based on Section 1158(a)(1)'s "context," which purportedly "shows that Congress intended the statute to apply to asylum seekers in the process of arriving." 1-ER-258–260. The court relied on *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005), for the proposition that "'[i]mmigration statutes, by their very nature, pertain to activity at or near international borders. It is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders.'" 1-ER-258–259. But *Villanueva* addressed the extraterritorial scope of a statute that imposes criminal penalties on a smuggler who "attempts to *bring to* the United States" a noncitizen who does not have prior authorization to enter. 8 U.S.C. § 1324(a)(2) (emphasis added). "Bring" is a verb that means "to take with oneself to a place," The American Heritage Dictionary of the English Language 239, so a statute penalizing a smuggler who "attempts to bring" noncitizens "to the United States" necessarily touches conduct that occurs outside the country. *See also id.* ("Usage Note: In most dialects of American English *bring* is used to denote motion toward the place of speaking or the place *from which the action is being regarded*." (emphasis added)). *Villanueva*, therefore, changes nothing in the points set forth above on Sections 1158 and 1225, which refer to a noncitizen who "arrives in the United States," 8 U.S.C. §§ 1158(a)(1), 1225(a)(1) (emphasis added), because "arrive" is a verb that means

"to reach a destination," The American Heritage Dictionary of the English Language 102; *see also Matter of Lewiston-Queenston Bridge*, 17 I. & N. Dec. 410, 413 (BIA 1980) ("when an individual comes to this country by way of an international bridge, he has 'landed' when he touches United States soil").

The presumption against extraterritoriality also renders inapplicable the Dictionary Act's general rule (which the district court relied on, *see* 1-ER-255) that "the present tense include[s] the future as well as the present." 1 U.S.C. § 1. Applying the Dictionary Act's general rule here would impermissibly give Sections 1158 and 1225 extraterritorial effect when there is no clear statement to that effect in either the Dictionary Act or the INA, and when the INA says otherwise. *See, e.g.*, *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 200 (1993) ("[O]rdinary rules of statutory construction would prefer the specific definition over the Dictionary Act's general one."). And the presumption against extraterritoriality likewise defeats the district court's view (at 1-ER-262–264) that other phrases in Section 1225—such as references to a noncitizen who "is arriving in" the United States, 8 U.S.C. § 1225(b)(1)(A)(ii), or who is "otherwise seeking" admission, *id.* § 1225(a)(3)—encompass noncitizens who are not within the United States. *See Sale*, 509 U.S. at 173 & n.29 (reasoning that "[t]he reference to the Attorney General in the statutory text is significant . . . because it suggests that [the statute] applies only to the Attorney General's normal responsibilities under the INA" and

stating that "other provisions of the INA," including Section 1158(a), "obviously contemplate that such proceedings would be held in the country"); *id.* at 161–62 & n.11. Given the fact that DHS's obligations to "inspect" a noncitizen are not triggered until the noncitizen is in the United States, it makes little sense to read Section 1225 to require referral for an asylum interview before immigration officers are obligated or even permitted to conduct inspections. Similarly, there is no textual basis to assume that the reference in Section 1225(a)(3) to noncitizens who are "otherwise seeking admission" includes noncitizens who are abroad. Rather, it refers to noncitizens who are subject to inspection but are also deemed by statute not to be applicants for admission—for example, lawful permanent residents, who generally must be inspected by immigration officers but "shall not be regarded as seeking admission into the United States" unless an exception applies. 8 U.S.C. § 1101(a)(13)(C).

Applying the rule against surplusage, the district court also thought that Section 1158(a)(1)'s reference to a noncitizen "who is physically present in the United States" already covers noncitizens in the United States, so the reference to a noncitizen "who arrives in the United States" must apply to another group—in essence, "an alien who may not yet be in the United States, but who is in the process of arriving in the United States" through a Port of Entry. 1-ER-253, 1-ER-255. Not so. Congress included both groups of noncitizens in Sections 1158(a)(1) and 1225(a)(1) to

ensure that both noncitizens within the United States (those who are "physically present") and noncitizens subject to expedited removal (those who are "arriving in" the United States) both may apply for asylum. Without such clarifying language, Congress risked an interpretation of those statutes that would permit only a noncitizen in the interior to apply for asylum. "When an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but" under a legal fiction, "the alien is not considered to have entered the country" and is "treated . . . as if stopped at the border." *Thuraissigiam*, 140 S. Ct. at 1982; *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (excludable noncitizen denied admission at Ellis Island and later paroled into the United States "was still in theory of law at the boundary line and had gained no foothold in the United States"). By using both the phrase "physically present in the United States" and the phrase "arrives in the United States," Congress made clear that even "aliens who arrive at ports of entry," *Thuraissigiam*, 140 S. Ct. at 1982, may apply for asylum, notwithstanding the legal fiction that they were stopped at the border. *See, e.g.*, *Sale*, 509 U.S. at 174–76 (reasoning that both deportable and excludable noncitizens would presumptively "continue to be found only within United States territory" after enactment of the Refugee Act of 1980); *Torres*, 976 F.3d at 928 (recognizing that "IIRIRA did away with th[e] entry doctrine . . . anomaly" under which noncitizens "who were attempting to lawfully enter the

United States were in a worse position than persons who had crossed the border unlawfully").

The district court's reading also disregards the fundamental structural distinction in the INA between refugee processes under 8 U.S.C. § 1157 and asylum under 8 U.S.C. § 1158. Under those provisions, "[r]efugees apply from abroad; asylum applicants apply when already here." *Kiyemba v. Obama*, 555 F.3d 1022, 1030 (D.C. Cir. 2009), *judgment reinstated as amended*, 605 F.3d 1046 (D.C. Cir. 2010); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1980) ("Section [1157] governs the admission of refugees who seek admission from foreign countries. Section [1158] sets out the process by which refugees currently in the United States may be granted asylum."); *Yang v. INS*, 79 F.3d 932, 938 (9th Cir. 1996) (same); *East Bay Sanctuary Covenant*, 932 F.3d at 773 ("By definition, asylum concerns those 'physically present in the United States.'"); *Robleto-Pastora v. Holder*, 591 F.3d 1051, 1061 (9th Cir. 2010) ("The Refugee Act . . . required the Attorney General to establish procedures for 'determining asylum claims filed by aliens who are physically present in the United States.'") (quoting S. Rep. 96-256, at 9 (1980)). To hold that a noncitizen still outside the United States has a right to seek asylum would threaten to collapse the distinction between Sections 1157 and 1158.

Sections 1158 and 1225 thus apply exclusively to noncitizens who have crossed the border into the territorial United States. Undocumented migrants have

no statutory right to apply for asylum while they stand in Mexico, and the Government has no statutory obligation to inspect them for admission or process them for expedited removal or refer them for credible-fear interviews. Plaintiffs thus cannot show that, by metering, CBP "failed to take a *discrete* agency action that it is *required* to take," *Norton*, 542 U.S. at 64, and the district court erred as a matter of law by granting summary judgment to Plaintiffs on their first APA claim under Section 706(1). Further, because the INA does not grant rights to or impose obligations toward noncitizens in Mexico, the Government was entitled to judgment on Plaintiffs' procedural due process claim and their second APA claim under 5 U.S.C. § 706(2).

## B. Metering Does Not "Unlawfully Withhold" Any Mandatory Agency Action on a Class-Wide Basis.

In any event, even if Sections 1158 and 1225 applied to noncitizens in Mexico, the district court incorrectly concluded that DHS and CBP "unlawfully withheld" those obligations on a class-wide basis. Section 706(1) "applies to the situation where a federal agency *refuses to act* in disregard of its legal duty to act." *Vietnam Veterans of America v. CIA*, 811 F.3d 1068, 1079 (9th Cir. 2016) (emphasis added). The undisputed evidence shows that Defendants' (now-superseded) metering practices were not a class-wide "refus[al] to act." *Id.* To the contrary, many class members *were* processed for asylum. Concurrently with the implementation of metering, the number of inadmissible arriving noncitizens placed into expedited removal and referred by the southern border Field Offices for credible-fear interviews increased

*four-and-a-half times over* from Fiscal Year 2017 (17,284) to Fiscal Year 2019 (80,055). 2-ER-523. This figure represents only a subset of class members who entered during this time period and ultimately applied for asylum in the United States, since CBP would have placed some additional number of class members into full removal proceedings, where they were able to raise their asylum claim before an immigration judge. *See Matter of E-R-M-*, 25 I. & N. at 521–24.

At most, metering *delayed* agency action, so as to enable CBP to effectively and humanely manage the queues of undocumented noncitizens into the Ports of Entry. In these circumstances, any such delay was eminently reasonable. When CBP engaged in metering across the southern border, its decisions were necessitated by, and designed to proactively avoid, overwhelming numbers of migrants seeking to appear for processing, the resultant overcrowding and unsanitary conditions at the Ports, and the prolonged diversion of staffing resources from other urgent statutory missions. *See supra* at Statement § B; 2-ER-516 (metering to be used when "necessary or appropriate to facilitate orderly processing"); 2-ER-526–531; 3-ER-817–818 (metering allowed field personnel "to prevent emergencies"). Further, the evidence shows that metering in fact facilitated orderly processing, since the southern border Field Offices referred more inadmissible arriving noncitizens for credible-fear interviews *after* the challenged metering memoranda were issued than immediately prior. *See* 2-ER-523.

The district court declined to address the question of reasonable delay—despite the fact that the Government moved for summary judgment on this basis[2]—and did not grapple with the Government's argument on this point. Instead, it applied the *Chevron* framework "to determine the meaning of the statutory language and whether it establishes whether Defendants can defer processing asylum seekers after they have arrived at a POE." 1-ER-109–110; *see also* 1-ER-109–117. At the first step, the court stated that "the plain meaning" of various provisions of Section 1225 "cuts in favor of a finding that inspection and referral attach when asylum seekers arrive at a POE for the first time." 1-ER-113. The court also applied the second *Chevron* step "out of an abundance of caution," 1-ER-113, and stated that metering was inconsistent with Congress's intent because "turning away" undocumented noncitizens "and requiring them to make their way back to the POE at least a second time to access asylum, create[s] additional, logistical barriers to entry that contravene the attempt of IIRIRA" to put legal and illegal border-crossers "'on equal footing'" in removal proceedings. 1-ER-114 (quoting *Torres*, 967 F.3d at 928).

---

[2] The Government moved for summary judgment on the entirety of Plaintiffs' Section 706(1) claim, *see* 2-ER-475, and Plaintiffs waived any argument against the reasonableness of any delay by failing to address that argument in their opening or opposition briefs, *see* 1-ER-109 (noting that "Plaintiffs . . . address this issue for the first time in reply").

This *Chevron* analysis is incorrect and sidesteps the Government's point—which is that, even assuming that "inspection and referral [duties] attach when asylum seekers arrive at a POE the first time," 1-ER-113, that does not compel the conclusion under the APA that such action has been "unlawfully withheld" on a class-wide basis. 5 U.S.C. § 706(1). CBP continuously processed asylum seekers on the southern border concurrently with its implementation of metering. *See* 2-ER-523. This precludes any finding that CBP categorically "withheld" mandatory agency action on a class-wide basis. 5 U.S.C. § 706(1). In light of this fact, and considering the district court's recognition that "[t]here is no temporal element to" Section 1225 that controls "how much time can elapse between arrival and referral," 1-ER-111, and that "[t]here may in fact be times when capacity or resource constraints prevent Defendants from processing asylum seekers expeditiously," 1-ER-116, the proper question thus was whether metering amounts to an "unreasonabl[e] delay[]." 5 U.S.C. § 706(2); *see, e.g.*, *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999) ("[I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions—such as the APA's general admonition that agencies conclude matters presented to them 'within a reasonable time,' *see* 5 U.S.C. § 555(b)—a court must compel only action that is

delayed unreasonably."). As Plaintiffs waived any argument as to unreasonable delay, *see* 1-ER-109, the court should have entered summary judgment for the Government.

The district court's *Chevron* analysis also contradicts its own prior reasoning. The district court held that a noncitizen outside the United States is "in the process of arriving in the United States" and covered by Sections 1158 and 1225. 1-ER-255. Under that reasoning, the noncitizen remains "in the process of arriving" even if CBP does not allow him to immediately cross the border and he remains in Mexico, and there is no reason to say that inspection and referral is "withheld" merely because the noncitizen was not immediately allowed to cross the border. Thus, even assuming the court correctly determined that Sections 1158 and 1225 apply to noncitizens in Mexico, metering does not *withhold* CBP's inspection and referral duties, it merely delays them, and in this case reasonably so.

Similarly, the district court's conclusion that CBP withholds (rather than merely delays) inspection and referral through metering fails to account for the constitutional and statutory discretion afforded to the Executive in this regard. The authority to control the flow of travel across the border is rooted in the Government's "undoubted[]" constitutional power "to exclude aliens from the country." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973); *Carroll v. United States*, 267 U.S. 132, 154 (1925); *Knauff*, 338 U.S. at 542; *Mezei*, 345 U.S. at 210; *Kleindienst*

*v. Mandel*, 408 U.S. 753, 765–67 (1972); *Galvan v. Press*, 347 U.S. 522, 531 (1954); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659, 660 (1892); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889) ("Jurisdiction over its own territory . . . is an incident of every independent nation. It is a part of its independence."); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004); *Platero-Rosales v. Garland*, — F.4th —, 2022 WL 17689178, at *1 (5th Cir. Dec. 15, 2022) ("A sovereign isn't a sovereign if it can't control its borders."). Congress likewise vested in DHS and CBP the authority and duty to control the Nation's borders. *See* 6 U.S.C. §§ 111(b)(1), 202, 211(c), 211(g)(3). Metering is permissible against this backdrop and statutory scheme. Congress intended to afford DHS and CBP discretion as to how to implement all of their missions with respect to border and port security, *concurrently* with their discharge of immigration duties set forth in Section 1225. Although the district court reasoned that these "broad delegations of authority" cannot "nullif[y] CBP's obligations to inspect and refer, 1-ER-103–104 (citing 1-ER-273), it ignored that these statutory mandates provide ample reason for DHS and CBP to reasonably *delay* inspection when high volumes of individuals seek to cross.

"[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996). In light of this, the duties that the district court read into the statute cannot possibly be as inflexible as the district court (and Plaintiffs) contend.

CBP must be permitted, for example, to close its Ports to certain kinds of traffic or to control the flow of individuals into the Port to ensure the safety and security of those same individuals and the rest of the traveling public, as well as to address particularized threats. To hold otherwise would deprive the Executive of its statutory and constitutional authority to control the border.[3]

This Court should thus reverse the district court's decision and mandate entry of summary judgment to the Government on Plaintiffs' Section 706(1) claim.[4]

---

[3] The Government does not read the district court's definition of metering to include coordination with the Government of Mexico to "control the flow" of migrants to the U.S.-Mexico border. *E.g.*, 1-ER-100 (excluding CBP's coordination with the Government of Mexico from "the 'turnbacks' at issue"). If the order did encompass such coordination, that would violate the political question doctrine, as coordination with a foreign government to manage migration across a shared border constitutes a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217 (1962); *see Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—the 'political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (recognizing that "any policy toward aliens is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations").

[4] Because the district court concluded that metering is unlawful "regardless of [its] justification," 1-ER-117, it denied as moot the cross-motions for summary judgment on Plaintiffs' second APA claim that the Government's metering guidance should be set aside under 5 U.S.C. § 706(2), *see* 1-ER-3. For the reasons stated above, the district court should have entered judgment for the Government on this claim on purely legal grounds. *See supra* at Argument § I.A. In any event, Plaintiffs' Section 706(2) challenge to the metering guidance memoranda became moot when the Government rescinded that guidance. *See* 2-ER-314–316; 2-ER-318.

## II. The District Court Erred in Concluding That Metering Violates Procedural Due Process.

Separately, the district court incorrectly concluded, in its motion-to-dismiss order and again in its summary-judgment order, that the Due Process Clause applies extraterritorially to non-resident aliens in Mexico under the functional approach set forth in *Boumediene v. Bush*, 553 U.S. 723 (2008), and that the Government deprived class members of their procedural due process rights by not inspecting and referring them for credible-fear interviews under Sections 1158(a) and 1225 before they crossed the U.S.-Mexico border. 1-ER-287–294; 1-ER-117–121.

First, "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for International Development v. Alliance for Open Society International, Inc. (AID)*, 140 S. Ct. 2082, 2086 (2020) (collecting cases). That is especially true in the immigration context, where "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas*, 533 U.S. at 693. The Supreme Court's "rejection of extraterritorial application of the Fifth Amendment [is] emphatic." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). "[I]n extending constitutional protections beyond the citizenry, the [Supreme] Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave

the Judiciary power to act." *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950). Class members on Mexican soil have no basis to invoke the Fifth Amendment.

The district court, however, believed that the Supreme Court in *Boumediene* "squarely rejected bright-line rules regarding the extraterritorial application of the Constitution" writ large. 1-ER-288 (quoting *Boumediene*, 553 U.S. at 764). That is a broad overreading of that decision. *Boumediene* addressed whether the writ of habeas corpus is available to military combatants detained at the U.S. military base at Guantanamo Bay, not whether the Fifth Amendment applies extraterritorially in areas that the U.S. Government does not control. 553 U.S. at 732. Nor is *Boumediene* "about immigration at all." *Thuraissigiam*, 140 S. Ct. at 1981. That decision did nothing to undermine the bedrock principle that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon* v. *Plasencia*, 459 U.S. 21, 32 (1982); *see also Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 (1953) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores."); *Movimiento Democracia, Inc. v. Johnson*, 193 F. Supp. 3d 1353, 1375 n.12 (S.D. Fla. 2016) (holding that migrants who landed at a lighthouse off the Florida coast were "not . . . 'present in this country' pursuant to the INA" and, consequently, could not invoke the Fifth Amendment).

Even if the Fifth Amendment's extraterritorial reach were not controlled by the bright-line rule running throughout immigration law, the district court still misapplied *Ibrahim v. Department of Homeland Security*, 669 F.3d 983, 997 (9th Cir. 2012), which requires courts to apply "the 'functional approach' of *Boumediene* and the 'significant voluntary connection' test of *Verdugo-Urquidez*" to determine whether constitutional protections apply to noncitizens outside the United States. Plaintiffs never alleged or proved that class members have "significant voluntary connection[s]" to the United States. *Id.* Consequently, none of them have any warrant to invoke the Fifth Amendment.

In its motion-to-dismiss order, however, the court asserted that *Ibrahim* "does not constitute a ceiling on the application of the Constitution to aliens." 1-ER-289–290. Instead, under *Rodriguez v. Swartz*, 899 F.3d 719, 729 (9th Cir. 2018), "[n]either citizenship nor voluntary submission to American law is a prerequisite for constitutional rights." 1-ER-290; *see also* 1-ER-118–119. That was wrong. *Rodriguez* was vacated by the Supreme Court during the pendency of this litigation, so it has no precedential value. *See Swartz v. Rodriguez*, 140 S. Ct. 1258 (2020). And even if it were still good law, *Rodriguez* was a case assessing whether a Fourth Amendment claim is available in a *Bivens* action for a cross-border shooting, not whether the Fifth Amendment applies in the immigration context to undocumented noncitizens in Mexico. *See* 899 F.3d at 734 ("we do not analyze the Fifth Amendment claim

here"). It has no application here. Even assuming the Fifth Amendment could apply to noncitizens in Mexico, none have satisfied this Court's test set forth in *Ibrahim*.

Second, even if the Fifth Amendment applied, "the only procedural rights of an alien seeking to enter the country are those conferred by statute." *Thuraissigiam*, 140 S. Ct. at 1977. Plaintiffs' due process claim fails because Sections 1158(a) and 1225 do not apply to noncitizens in Mexico. *See supra* at Argument § I.A. And even if metering violates Sections 1158(a) and 1225, a deprivation of a statutory privilege does not (as the district court surmised) automatically violate the Due Process Clause. *See, e.g.*, *Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("Mere violation of a . . . statute does not infringe the federal Constitution."). Finally, Plaintiffs must actually show that metering deprived them of their claimed statutory rights, which they cannot do on a class-wide basis in light of the undisputed evidence showing that many, many class members were ultimately processed for asylum when metering was in effect. *See* 2-ER-523. The court should have entered summary judgment for the Government.

## III. The District Court Erred in Granting Burdensome Class-Wide Injunctive and Declaratory Relief.

The district court independently erred by entering a class-wide permanent injunction against the application of the transit rule. 1-ER-4–5. Although the transit rule has been preliminarily enjoined in full in separate litigation, *see East Bay*, 519 F. Supp. 3d 363, the district court's injunction still has independent force, and it

imposes burdensome, retrospective requirements to reopen or reconsider past applications of the transit rule. For several reasons, this injunction was an abuse of discretion. Separately, the injunction is prohibited by 8 U.S.C. § 1252.

### A. The District Court Abused its Discretion.

First, the court abused its discretion by prohibiting the Government from applying an asylum-eligibility rule that was never challenged in the operative complaint and which has never been found unlawful in this litigation. Injunctive relief "must be narrowly tailored to give only the relief to which plaintiffs are entitled," *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990), and should not aim to "enjoin all possible breaches of the law," *Hartford-Empire Co. v. United States*, 323 U.S. 386, 410 (1945) (quotation marks omitted); *see also Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) ("An injunction against state actors must directly address and relate to the constitutional violation itself and must not require more of state officials than is necessary to assure their compliance with the constitution." (quotation marks and citations omitted)). The remedy for an APA violation is to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), not to mandate actions that are not otherwise required by statute. *See Norton*, 542 U.S. at 64 ("§ 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act'"); *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677

(2021) ("[A] reviewing court is 'generally not free to impose' additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel."). The court thus had no warrant to direct how DHS and EOIR process subclass members' asylum applications.

Second, the district court erred in enjoining the application of the transit rule on the theory that noncitizens "who attempted to enter or arrived at the southern border *before*" the transit rule's effective date were not subject to the rule "by its express terms," 1-ER-212, 1-ER-80, because, under the reasoning of the court's motion-to-dismiss order, they were already "arriving in" the United States before the rule took effect, *see* 1-ER-80. DHS and EOIR had statutory authority to promulgate the regulation under 8 U.S.C. § 1158(b)(2)(C), which necessarily includes the authority to fix the date on which, and define as to whom, those limitations and conditions apply. The court cited no authority permitting it to import its own interpretation of a different statute into the Government's interpretation of its own substantive rule. In any event, as explained above, *supra* at Argument § I.A, the district court's interpretation of Sections 1158(a)(1) and 1225 was wrong.[5]

---

[5] The injunction prohibits only the application of the interim final and final transit rules. Plaintiffs may contend, however, that the injunction precludes DHS and EOIR from applying later-promulgated administrative rules to class members. *See, e.g.*, 1-ER-132. This would be incorrect, as the injunction does not "state [such] terms specifically" nor describe any such prohibitions "in reasonable detail." Fed. R. Civ. P. 65(d)(1); *see Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992) (injunction requiring sheriff's department "to follow 'the Department's own stated

## B.    The INA Bars the Injunctive Relief Ordered.

The injunction's requirement that the government reopen and reconsider removal proceedings in which the Transit Rule was previously applied violates multiple statutory prohibitions on such collateral attacks on completed removal proceedings. *See* 8 U.S.C. § 1252(a)(2)(A) ("no court shall have jurisdiction . . . to entertain any . . . cause or claim arising from or relating to the implementation or operation of an [expedited] order of removal"); *id.* § 1252(a)(5) ("[A] petition for review . . . shall be the sole and exclusive means for judicial review of an order of removal"); *id.* § 1252(b)(9) ("Judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order"); *id.* § 1252(e) ("no court may . . . [grant] equitable relief in any action pertaining to an order to exclude an alien [pursuant to expedited removal]").

The injunction also is prohibited by 8 U.S.C. § 1252(f)(1), which provides:

---

policies and guidelines regarding the use of force and procedures for conducting searches,'" without "defin[ing] what the policies are, or how they can be identified," "fails to specify the act or acts sought to be restrained as required by" Rule 65(d)). Further, such an injunction would be an abuse of discretion because subclass members are not entitled to the rules that existed when they first approached the southern border. Generally, adjudicators "must apply the law in effect at the time it renders its decision," *Henderson v. United States*, 568 U.S. 266, 271 (2013) (citations omitted), and an "entering alien . . . may be excluded if unqualified for admission *under existing immigration laws*"—"whether he has been here once before or not." *Mezei*, 345 U.S. at 213 (emphasis added).

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). Congress's prohibition on class-wide orders that enjoin or restrain "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." *Aleman Gonzalez*, 142 S. Ct. at 2064. "[T]he operation of the provisions is a reference not just to the statute itself but to the way that it is being carried out." *Id.* (alterations and quotation marks omitted).

Although the transit rule has been enjoined in separate litigation, *see East Bay*, 519 F. Supp. 3d 663, the district court's injunction enjoins or restrains the operation of 8 U.S.C. § 1225(b)(1)(B) in violation of Section 1252(f)(1) by prohibiting asylum officers from entering negative credible-fear determinations in expedited removal, when the basis for the negative determination is the transit bar. Under the regulations promulgated in the transit rule, if a noncitizen referred for a credible fear interview under 8 U.S.C. § 1225(b)(1)(B)(v) is found to be subject to the substantive transit bar, asylum officers "shall enter a negative credible fear determination with respect to the alien's application for asylum." 8 C.F.R. § 208.30(e)(5)(iii); 84 Fed. Reg. at 33,837 (quoting 8 U.S.C. § 1225(b)(1)(B)(v)). The injunction, however, prohibits

asylum officers from making such a negative credible-fear determination under Section 1225(b)(1)(B) if the noncitizen's inability to establish a "significant possibility . . . [of] eligibility for asylum," 8 U.S.C. § 1225(b)(1)(B)(v), is because of the transit bar. The injunction thus enjoins and restrains "the Government's efforts to enforce or implement" Section 1225(b)(1)(B), *Aleman Gonzalez*, 142 S. Ct. at 2064, by barring asylum officers from making negative credible-fear determinations when there is not a "significant possibility" that the noncitizen "could establish eligibility for asylum." 8 U.S.C. §§ 1225(b)(1)(B)(ii), (v). And of course, the lower court's directive to "reopen or reconsider" past determinations of asylum ineligibility based on the transit rule, 1-ER-4–5, suffers from the same infirmity, because it affirmatively requires the Government to disturb determinations that have already been made under Section 1225(b).

The district court reasoned that Section 1252(f)(1) did not bar its injunction because, under *Gonzalez v. Department of Homeland Security*, 508 F.3d 1227 (9th Cir. 2007), courts may issue class-wide injunctions that "'enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision.'" 1-ER-80 (quoting *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4). The court reasoned that the transit bar "'directly implicates' 8 U.S.C. § 1158(b)(2)(C), the statute under which it was issued, not one of § 1252(f)(1)'s covered provisions." 1-ER-80.

That is incorrect. Although the rule was *promulgated* under Section 1158(b)(2)(C), it *operates* in expedited removal under Section 1225(b), which is one of Section 1252(f)(1)'s covered provisions. As even the district court believed, there is "no doubt" that its injunction affects "the removal proceedings of potential and actual [subclass] members." 1-ER-80. The injunction prohibits asylum officers from complying with 8 C.F.R. § 208.30(e)(5)(iii), an implementing regulation for expedited removal. The prohibition on applying the transit bar in expedited removal, and the directive to reopen past applications of the rule in expedited removal, thus restrain "the way that" Section 1225(b)(1)(B) "is being carried out" by the Government on a class-wide basis. *Aleman Gonzalez*, 142 S. Ct. at 2064. In that manner, the district court's class-wide injunction is distinct from the injunction in *Gonzalez* because that injunction did not apply to a regulation that implements a covered provision of Section 1252(f)(1). *See Gonzalez*, 508 F.3d at 1232 (injunction prohibiting DHS from denying waivers of inadmissibility sought under 8 U.S.C. § 1189(a)(9)(C)(ii)).

The injunction also impermissibly enjoins or restrains the operation of 8 U.S.C. § 1229a(c)(4) in removal proceedings, by prohibiting immigration judges and the Board of Immigration Appeals from applying certain eligibility criteria in assessing any application "for relief or protection from removal." 8 U.S.C. § 1229a(c)(4)(A). Section 1229a(c)(4) provides that "[a]n alien applying for relief

or protection from removal has the burden of proof to establish" his eligibility for asylum and "merits a favorable exercise of discretion." 8 U.S.C. § 1229a(c)(4)(A). One such eligibility requirement was the one established by the transit rule. *See* 84 Fed. Reg. at 33,831.

The district court's injunction prohibits immigration judges from holding subclass members in removal proceedings to their statutory burden of demonstrating that they "satisf[y] the applicable eligibility requirements," 8 U.S.C. § 1229a(c)(4)(A)(i), when one of the grounds of ineligibility is (or was) the transit bar. Likewise, the injunction precludes immigration judges from requiring class members to prove that they merit the "favorable exercise of discretion," *id.* § 1229a(c)(4)(A)(ii), when they cannot meet that burden because of the transit bar. And, the directive to "reopen or reconsider" asylum denials made in removal proceedings, 1-ER-4, requires immigration judges to exercise their "independent judgment and discretion," 8 C.F.R. § 1003.10(b), in the manner directed by the district court. The injunction thus impermissibly compels EOIR adjudicators "to take actions that (in the Government's view) are not required by" Section 1229a or its implementing regulations, "and to refrain from actions that (again in the Government's view) are allowed by" Section 1229a. *Aleman Gonzalez*, 142 S. Ct. at 2065. Such directives are prohibited by the INA.

Finally, the Government preserves for further review its position that Section 1252(f)(1) also prohibits the class-wide declaratory judgment here, to the extent that order functions like a class-wide injunction. However, the Government acknowledges that this argument is foreclosed by Circuit precedent. *See Rodriguez* v. *Hayes*, 591 F.3d 1105, 1119 (2009) ("Section 1252(f) was not meant to bar classwide declaratory relief.").

## CONCLUSION

This Court should reverse the decision below and remand with directions to enter summary judgment for the Government and to vacate the declaratory and injunctive relief.

//

DATED: December 20, 2022          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

KATHERINE J. SHINNERS
Senior Litigation Counsel

*/s/Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation -
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
Email: alexander.j.halaska@usdoj.gov

*Counsel for the Government*

## CERTIFICATE OF SERVICE

I certify that on December 20, 2022, I served a copy of this document on the Court and all parties by filing it with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and a link to this document to all counsel of record.

DATED: December 20, 2022       Respectfully submitted,

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice

*Counsel for the Government*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Federal Rules of Appellate Procedure 32(a)(4) and 32(a)(5) because it is double-spaced, has margins of at least one inch on all four sides, and uses proportionally-spaced, 14-point Times New Roman font.

I certify that this brief complies with the type-volume limitation of Circuit Rule 28.1-1(b) because it contains 13,846 words, including headings and footnotes, as measured by the word processing application used to prepare this brief.

DATED: December 20, 2022       Respectfully submitted,

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
U.S. Department of Justice

*Counsel for the Government*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, I hereby certify that there are no known or related cases currently pending in this Court. Two previous appeals to this Court were dismissed as moot upon entry of final judgment below. *See Al Otro Lado v. Wolf*, No. 19-56417 (9th Cir. dismissed Sept. 20, 2022); *Al Otro Lado v. Wolf*, No. 20-56287 (9th Cir. dismissed Sept. 20, 2022).


DATED: December 20, 2022       Respectfully submitted,

                                        */s/ Alexander J. Halaska*
                                        ALEXANDER J. HALASKA
                                        Trial Attorney
                                        U.S. Department of Justice

                                        *Counsel for the Government*